## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | |
|---|---|
| Christine Delmater, Stephanie Speicher on behalf of the themselves and all other similarly situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>SCANA Corporation,<br><br>     Defendant. | 3:17-cv-02563-CMC<br><br>**COMPLAINT**<br>**CLASS CERTIFICATION**<br>**REQUESTED**<br>**JURY TRIAL DEMANDED** |

The Plaintiffs named above, complaining of the Defendant herein, would respectfully show unto the Court:

## PARTIES

1.      Plaintiffs are citizens and residents of the State of South Carolina that are within the service area of SCANA's subsidiary South Carolina Electric & Gas (SCE&G.)

2.      The potential members of the class of plaintiffs (hereinafter "Plaintiff Class") are so numerous as to be impracticable to join all to the instant actions.

3.      Defendant SCANA Corporation is a corporation organized and existing under the laws of the State Carolina. It operates by and through its wholly owned subsidiary South Carolina Electric & Gas (SCE&G) to supply electricity to residential, commercial and governmental customers in various counties of the State of South Carolina. SCE&G's service area includes parts of 24 counties in central and southern South Carolina. It serves the metropolitan areas of Charleston, Columbia, Lexington, Beaufort and Aiken and many other

smaller cities and towns, and rural areas in South Carolina. SCANA and SCE&G are hereinafter collectively referred to hereafter as "SCANA."

4.    South Carolina Service Authority (herein after "Santee Cooper") is a body corporate and politic of the State of South Carolina, organized under Title 58 of the Code of Laws of the State of South Carolina. Santee Cooper acts as a public utility and supplies electricity to residential, commercial and governmental customers in various counties of the State of South Carolina.

5.    SCANA and Santee Cooper are public utilities with exclusive franchises to provide electricity within their service areas. Plaintiff Class members have no choice but to purchase electricity from SCE&G and Santee Cooper if their property is within their franchise areas.

6.    SCANA and Santee Cooper are regulated by the South Carolina Public Service Commission (SCPSC). The SCPSC is tasked with protecting the public from predatory and monopolistic behavior by the utilities it regulates such as SCANA and Santee Cooper such as unfair rate hikes, lack of competition, etc.

7.    Any deceitful activity by SCANA and/or Santee Cooper towards the SCPSC necessarily impacts the public in general and Plaintiff Class in particular.

8.    While the exact number of Plaintiff Class members is unknown to Plaintiffs at this time, a good faith estimate is that a large portion of the residents and businesses in South Carolina buy their electricity from SCANA.

9.    The Plaintiff Class specifically excludes employees, officers and agents of the SCANA and Santee Cooper.

10.     The Plaintiff Class also specifically excludes the Justices of the United States Supreme Court, the Justices of the South Carolina Supreme Court, the Judges of the Fourth Circuit Court of Appeals, the Judges of the United States District Court of South Carolina, the Judges of the South Carolina Court of Appeals, Judges of the South Carolina Courts of Common Pleas, and all employees, officers and agents of these same courts.

11.     Plaintiffs' claims are typical of the claims of the members of the Plaintiff Class as all members of the Plaintiff Class are similarly affected by SCANA's wrongful conduct in violation of the various federal and state laws described herein.

12.     Plaintiffs will fairly and adequately protect the interests of the members of the Plaintiff Class.

13.     Plaintiffs have retained competent counsel, experienced in litigation involving breaches of statutory duties and fraud.

14.     Common questions of law and fact exist as to all members of the Plaintiff Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Plaintiff Class are, *inter alia*:

   a)  Whether SCANA has violated the laws of the United States as outlined herein;

   b)  Whether SCANA has violated the law of South Carolina as outlined herein;

   c)  Whether SCANA owed a duty in tort to the Plaintiff Class;

   d)  Whether SCANA owed a duty in contract to the Plaintiff Class concerning the construction of the Reactor project.

   e)  Whether SCANA knew or should have known of potential design issues with the construction of the Reactor project as set forth more fully herein; and/or

f)   Whether SCANA has acted in a commercially reasonable and prudent manner in the selection, design, supervision and administration of the contract to construct the Reactor project.

## JURISDICTION & VENUE

15.     This Court has subject-matter jurisdiction, pursuant to 28 U.S.C.A. § 1331, over the claims in this lawsuit.

16.     This Court has personal jurisdiction over SCANA because it is organized under the laws of the State of South Carolina, has its corporate headquarters within the State of South Carolina, and the events giving rise to the matter in controversy occurred within the State of South Carolina.

17.     This Court has supplemental jurisdiction to hear and decide relevant causes of action arising under the laws of the State of South Carolina.

18.     Venue is proper under 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) as all events giving rise to the claims occurred in this district.

19.     Venue is proper in this division pursuant to Local Civil Rule 3.01 DSC.

## FACTUAL ALLEGATIONS

20.     Each and every allegation contained in the preceding paragraphs is reiterated as if repeated verbatim to the extent it is not inconsistent with this cause of action.

21.     On or about February 2006, SCANA and Santee Cooper announced a plan to construct two nuclear reactors at SCANA's V.C. Summer facility in Fairfield County (hereinafter "the Reactor project.")

4

22.     In 2007, the State of South Carolina enacted the Base Load Review Act, S.C. Code Ann. § 58-33-210, *et. seq.* (hereinafter the "Base Load Review Act") to provide to SCANA and Santee Cooper a stable funding mechanism to construct the Reactor project. The Base Load Review Act is incorporated herein by reference.

23.     Upon information and belief, SCANA lobbied the General Assembly heavily for the passage of the Base Load Review Act.

24.     The Reactor project is a partnership owned 55% by SCANA and 45% by Santee Cooper which is separate and distinct from its owners.

25.     As partners, SCANA and Santee Cooper are jointly and severally liable for any liability incurred by the Reactor project pursuant to Each partner is jointly and severally liable for any liability incurred by the partnership pursuant to S.C. Code Ann. § 33–41–370, and S.C. Code Ann. § 33–41–370 is incorporated herein by reference.

26.     On or about May 30, 2008, SCANA on behalf of itself and Santee Cooper and in furtherance of the Reactor project filed an application pursuant to the Base Load Review Act for approval to charge the Plaintiff Class members in advance for the construction of the Reactor project by and through rate hikes in addition to charges for electricity purchased by Plaintiff Class.

27.     On or about May 23, 2008, SCANA and Santee Cooper hired Westinghouse Electric Company ("Westinghouse") and Stone & Webster, Inc. ("Stone & Webster) as the prime contractors for the construction of the Reactor project.

28.     At the time of its filing, SCANA and Santee represented to its customers by and through their filings with South Carolina Public Service Commission (SCPSC) that the Reactor project was, *inter alia*:

a)  Necessary to meet the expected growth in future customer needs;

b)  Necessary for providing reasonably priced electricity to the Plaintiff Class;

c)  The construction of the Reactor project was the most cost efficient way of meeting future customer needs;

d)  Would utilize the Westinghouse's AP1000 Reactor project Design which contained technologically advanced design features;

e)  Would be constructed using standardized designs pre-approved by the Nuclear Regulatory Commission and use advanced modular construction techniques;

f)  Would cost approximately $9.8 billion;

g)  Approving funding in advance would save Plaintiff Class money in the future because the Reactor project would be built at a lower cost;

h)  Time was of the essence in that other nuclear power plants were expected to be built in other locations;

i)  The Reactor project would be completed by April 1, 2016 for one unit and January 1, 2019 for a second unit.

29.     At the time SCANA and Santee Cooper made the application, SCANA and Santee Cooper knew or should have known:

a)  The Reactor project design they had selected had never been constructed before;

6

b) The Reactor project design they had selected had not been approved by the Nuclear Regulatory Commission;

c) That construction of the Reactor project included a substantial risk of failure that SCANA and Santee Cooper actively concealed and/or publicly minimized;

d) Upon information and belief, the risk of failure of the Reactor project was so great that neither SCANA nor Santee Cooper would have commenced the Reactor project but for the funding pursuant to the Base Load Review Act;

e) Upon information and belief, SCANA knew or should have known that SCANA's bottom line would be enhanced if the Reactor project was approved by the SCPSC regardless if the Reactor project was actually finished..

30.    The Base Load Review Act imposes a duty on SCANA by requesting and accepting funding through this Reactor project to act in a reasonably prudent manner in the construction of the Reactor project.

31.    The Base Load Review Act also imposes a duty on SCANA to supervise Westinghouse and Stone & Webster so that Westinghouse and Stone & Webster also acted in a reasonably prudent manner.

32.    The Nuclear Regulatory Commission likewise imposes duties upon SCANA to properly supervise the construction of the Reactor project.

33.    The information provided by SCANA and Santee Cooper to the SCPSC was false or materially false including, *inter alia*:

a) The expected price of the Reactor project;

b) The expected output of the Reactor project;

c) The expected date the Reactor project would come into service;

d) The expected need for the Reactor project for future capacity requirements;

e) The expected risk of delay in constructing the Reactor project;

f) The expected risk of failure to cost-effectively construct the Reactor project;

g) The expected purpose of the Reactor project to sell electricity to consumers within the State of South Carolina when in fact it was to be utilized to sell electricity to customers outside of the State of Carolina;

34.     SCPSC approved SCANA and Santee Cooper's proposal to construct the Reactor project on or about March 2, 2009 pursuant to the Base Load Review Act by way of Order No. 2009-104(A).

35.     SCPSC relied upon the representations made by SCANA and Santee Cooper to approve their request to bill Plaintiff Class in advance of the construction of the Reactor project.

36.     The risk of constructing the Reactor project was reasonably foreseeable in that groups opposed to the Reactor project presented statistics and Reactor projections that later proved to be accurate to the SCPSC but that SCANA disputed those forecasts before the SCPSC.

37.     SCANA's disputing the groups opposed to the Reactor project was done in bad faith.

38.     SCANA had a pecuniary interest in making these false or materially false allegations as the Base Load Review Act shifts the burden of both financing and risk of construction from itself onto the Plaintiff Class.

39.     By force of law, SCANA and Santee Cooper were then allowed to charge and Plaintiff Class was required to pay funds in advance for the construction of the Reactor project tin addition to the cost of the electricity they had consumed.

40.     Between 2009 and 2012, SCANA and Santee Cooper were allowed to conduct preconstruction activity on the site while increasing rates to support these costs for the Reactor project.

41.     Upon information and belief, construction began on the Reactor project in 2012 with major concrete placement being completed in 2013.

42.     On or about 2012, the cost Reactor projections and delays meant that SCANA and Santee Cooper knew or should have known that continued work on the Reactor project was wasteful and that deadlines could not be met.

43.     SCANA and Santee Cooper knew or should have known as early as 2012 that the Reactor project could not be completed for the amounts it had forecasted.

44.     Despite numerous representations to the contrary in 2012, SCANA and Santee Cooper did not adequately control costs or supervise Westinghouse and/or Stone & Webster.

45.     In or about 2012, SCANA and Santee Cooper knew or should have known that continued construction of the Reactor project was wasteful and was not in the public interest.

46.     In or about 2012, SCANA and Santee Cooper continued their representations of the following to the SCPSC which were false or materially false:

a)  The expected price of the Reactor project;

b)  The expected output of the Reactor project;

c)  The expected date the Reactor project would come into service;

d) The expected need for the Reactor project for future capacity requirements;

e) The expected risk of delay in constructing the Reactor project;

f) The expected purpose of the Reactor project to sell electricity to consumers within the State of South Carolina when in fact it was to be utilized to sell electricity to customers outside of the State of Carolina;

47.    In 2014, SCANA and Santee Cooper hired the Betchel Corporation to do an exhaustive review of the Reactor project.

48.    On or about February 5, 2016, Betchel Corporation produced a report which laid bare the inadequacies of the management of the Reactor project by SCANA and Santee Cooper. These deficiencies include, *inter alia*:

a) Contractors' construction plans were not specific to the Reactor project and, thus could not serve as a firm basis to calculate the Reactor project's cost or completion date;

b) At one point, the number of supervisors was "quite high" when compared to the 800 craft works on the Reactor project;

c) Contractors' designs needed "significant" changes before construction;

d) Reactor project managers had not planned far enough ahead to adapt to the need for design changes;

e) Turnover among non-manual workers was high;

f) Productivity dipped because of bad designs, sustained overtime, complicated work packages and an aging workforce;

g) Employees worked to many hours for an extended period of time;

h) SCANA and/or Santee Cooper should hire an experienced management company instead of relying on their own staffs; and/or

i) SCANA and Santee Cooper should sit down with its contractors to reassess the Reactor project' goals and realistically forecast its remaining cost and completion date;

49. Upon information and belief, neither SCANA nor Santee Cooper materially acted on the recommendations made by Bechtel to improve and/or salvage the Reactor project.

50. Upon information and belief, SCANA and Santee Cooper actively concealed the existence and/or content of these reports to the public in general and the SCPSC in particular.

51. Between 2007 and 2017, SCANA asked for additional rate increases for construction costs to cover cost overruns and delays.

52. Upon information and belief, SCANA asked for additional rate increases even after receipt of the Bechtel report.

53. The SCPSC again relied upon the representations made by SCANA and Santee Cooper and issued an order allowing additional charges to customers.

54. Upon information and belief, SCANA and Santee Cooper have spent approximately $9 billion on the Reactor project.

55. The Reactor project has plagued with design and construction issues that have caused long delays and massive cost overruns.

56. The design and construction issues were reasonably foreseeable to SCANA in advance of asking for funding through the Base Load Review Act.

57.     On or about February 14, 2014, SCANA revised the completion schedule to December 15, 2017 for one Reactor project and December 15, 2018 for the other.

58.     In October 2016, SCANA and Westinghouse conducted a Reactor project review and agreed to a new or revised contract in the amount of $14 billion dollars.

59.     Upon information and belief, the Reactor project is only one-third complete as of August 2017 and would cost approximately $23 billion if completed.

60.     Upon information and belief, SCANA has raised the rates on Plaintiff Class members nine times to fund the Reactor project. Upon further information and belief, approximately 18% of a SCANA's customer's power bill pays for the Reactor project plant and Plaintiff Class Members have contributed $1.4 billion towards the Reactor project.

61.     Upon information and belief, Santee Cooper has raised the rates on Plaintiff Class five times.

62.     SCANA paid its executives handsome bonuses—even when the Reactor project veered toward abandonment—including bonuses for work directly related to the Reactor project according to SCANA's filings with the Securities and Exchange Commission ("SEC") including, *inter alia:*

> a) Chief Executive Officer and Chairman of the Board for SCANA Kevin Marsh received a bonus of $3.3 million in 2016 in part for "oversight and support" of the Reactor project construction activities;
>
> b) Chief Financial Officer for SCANA Jimmy Addison received a bonus of $620,000 in 2016 in part for efforts to secure financing relating to the Reactor project;

c) Chief Operating Officer for SCANA Stephen Byrne received a bonus of $620,000 in 2016 in part for his continuing oversight of various aspects the Reactor project construction activities;

d) Additional sums went to lower ranking employees in part due to construction of the Reactor project;

e) In 2014, SCANA's top executives including SCANA and Santee Cooper received a performance based bonus relating in part to due to "operational excellence while pursuing our new Reactor project construction Reactor project" equal to approximately 20% of their base pay;

f) Stephen Byrne received a bonus in 2012 for $184,750 for his "efforts and achievements associated with our new Reactor project construction Reactor project;"

g) Overall, the pay of SCANA's top executives including SCANA and Santee Cooper increased to $14 million in 2016 from $8.5 million in 2007;

h) Overall, SCANA has paid its executives and employees including SCANA and Santee Cooper $21,361,837 in performance based bonuses related in part or in whole to the Reactor project since 2007; and/or

i) Overall, SCANA has paid its executives and employees including SCANA and Santee Cooper $3,425,855 in additional discretionary bonuses related in part or in whole to the Reactor project since 2007;

63. SCANA paid these bonuses with the full knowledge of the existing problems with the Reactor project and/or the contents of the Bechtel report.

64.     SCANA and Santee Cooper knew or should have known:

a)  The cost estimates for the Reactor project were unreasonably low;

b)  That a decrease in electricity consumption and demand greatly reduced the need to construct the Reactor project;

c)  The existence of cheaper alternatives that would have supplied any actual increase in electricity consumption and demand generated by economic growth;

d)  The Reactor project design was untested which increased the likelihood of extra design and construction costs;

e)  The Reactor project design as presented for approval to the SCPSC was going to change after construction began;

f)  The proposed generating capacity greatly exceeded the future anticipated electricity growth of their customer base;

g)  That the construction timeline estimate was unreasonably optimistic;

h)  That construction delays were occurring so that costs would increase and the timeline estimate could not be achieved;

i)  That Westinghouse's inability to complete the Reactor project on time and on budget was and/or should have been manifestly evident before SCANA and Santee Cooper incurred substantial construction related costs;

65.     Westinghouse sought the protection of bankruptcy court on or about March 27, 2017.

14

66.    On or about July 31, 2017, SCANA and Santee Cooper announced it was abandoning the Reactor project allegedly due to the delays in construction, escalating costs, lower Reactor projections for energy needs of Plaintiff Class.

67.    On or about July 21, 2017, the parent company of Westinghouse, Toshiba, announced it had reached a settlement with SCANA and Santee Cooper for $2.2 billion dollars for costs associated with Westinghouse's failure to perform.

68.    SCANA announced its intentions to charge its customers within the Plaintiff Class for costs associated with shutting down the Reactor project. Upon information and belief, this amount is approximately $2 billion spread over 60 years.

## FOR A FIRST CAUSE OF ACTION
### Violation of the Racketeer Influenced and Corrupt Organizations Act
### As to all SCANA and Santee Cooper

69.    Each and every allegation contained in the preceding paragraphs is reiterated as if repeated verbatim to the extent it is not inconsistent with this cause of action.

70.    Plaintiffs hereby incorporates 18 U.S.C.A. § 1961, *et. seq.* by reference.

71.    SCANA is a "person" within the meaning of 18 U.S.C.A. § 1961(3).

72.    SCANA and Santee Cooper are part of an ongoing organization, the Reactor project, in which the various associates act as a continuing unit in the construction of the Reactor project and the continuing to bill Class Plaintiffs for the Reactor project. Each bill sent to each Class Plaintiff continues the activities of the enterprise.

73.    The actions in the Reactor project enterprise—specifically the overcharging Class Plaintiffs for the construction of nuclear reactors they did not need and could not construct for

the price or time as set forth aforesaid—are separate and apart from the legitimate activities for which SCANA and Santee Cooper are entitled to lawfully engage.

74.     At all times relevant to this action, the Reactor project constitutes an association-in-fact enterprise within the meaning of 18 U.S.C.A. § 1961(4) which engages in activities of interstate commerce.

75.     All times relevant to this action, SCANA was associated with the Reactor project along with Santee Cooper yet remained separate and distinct from the Reactor project.

76.     SCANA in furtherance of the Reactor project has engaged in two or more acts of racketeering by making numerous false and/or fraudulent statements to the SCPSC and the public, *inter alia*:

a)  The cost estimates for the Reactor project made by SCANA and Santee Cooper on numerous separate occasions were unreasonably low;

b)  That SCANA and Santee Cooper were not aware of Westinghouse's inability to complete the Reactor project when in fact they were well aware of Westinghouse's deficient conduct;

c)  That SCANA and Santee Cooper were controlling costs and supervising Westinghouse when they knew or should have known was not true;

d)  Continuing to represent to the need for the Reactor project despite a decrease in electricity consumption and demand;

e)  The existence of cheaper alternatives that would have supplied any actual increase in electricity consumption and demand generated by economic growth;

16

f) The Reactor project design was untested which increased the likelihood of extra design and construction costs;

g) The Reactor project design as presented for approval to the SCPSC was going to change after construction began;

h) The proposed generating capacity greatly exceeded the future anticipated electricity growth of their customer base;

i) That the construction timeline estimate was unreasonably optimistic;

j) That construction delays were occurring so that costs would increase and the timeline estimate could not be achieved;

k) That Westinghouse's inability to complete the Reactor project on time and on budget was and/or should have been manifestly evident before SCANA and Santee Cooper incurred substantial construction related costs; and/or

l) SCANA and Santee Cooper were paying its officers and employees bonuses relating to the Reactor project on the premise the project was well managed while planning to shift the cost of failure onto Class Plaintiff.

77.    SCANA has engaged in racketeering by utilizing the mail and interstate wires to further the Reactor project scheme, *inter alia*, by mailing notices for electricity services which included additional sums from the Reactor project to Plaintiff Class members and by using the financial system and wires of interstate commerce to receive money from the Plaintiff Class members, etc.

78.    SCPSC relied on these false representations made by SCANA in order to approve SCANA's request to bill Class Plaintiff in advance.

17

79.    In turn, Class Plaintiffs relied on the representations by SCANA in order pay the bills for electricity services without protest.

80.    SCANA used and continues to use fear of economic harm and personal harm, *inter alia* the cessation of electricity services to Class Plaintiffs, to extort money from Class Plaintiffs, and these acts of economic extortion are a racketeering activity. Class Plaintiffs have no choice but to comply as SCANA has a monopoly within its service areas for the providing of electricity to customers.

81.    SCANA use false and deceptive testimony, reports, and projections to induce the SCPSC to approve the risky scheme constitutes racketeering activity by the SCANA.

82.    SCANA use of false and deceptive testimony, reports, and Reactor projections induced the SCPSC to approve the charges for the Reactor project makes the debts charged to Class Plaintiffs unlawful as SCPSC would not have approved the Reactor project had SCANA told SCPSC the truth.

83.    These acts have been committed on multiple occasions by SCANA throughout the State of South Carolina and constitute a pattern of behavior. In particular, each electricity bill sent to each of the Class Plaintiffs while including charges each month which includes charges for the Reactor project continues this enterprise.

84.    SCANA along with Santee Cooper actively concealed and/or expended time and effort to diminish any reports which were critical of and/or highlighted the inadequacies of their planning and performance of the Reactor project.

85.    SCANA along with Santee Cooper, despite contents of the Bechtel report, requested $850 million in new and additional funding in 2016.

86. SCANA along with Santee Cooper had a duty to disclose the Bechtel report to the SCPSC and public but did not do so.

87. SCANA and Santee Cooper would have not received approval for these additional funds if the Bechtel report had been disclosed to SCPSC.

88. SCANA's officers and employees have individually profited from the enterprise by and through bonuses they received from SCANA as part of the Reactor project as alleged aforesaid.

89. The activities of SCANA and Santee Cooper affect interstate commerce, *inter alia:* the funding and purchasing of products outside of the State of South Carolina, the alleged importation of products into South Carolina; *etc.*

90. Plaintiff Class Members have suffered damages as will be proven at trial.

## <u>FOR A SECOND CAUSE OF ACTION</u>
### Negligence

91. Each and every allegation contained in the preceding paragraphs is reiterated as if repeated verbatim to the extent it is not inconsistent with this cause of action.

92. SCANA owes a duty of care to Class Plaintiffs in one or more of the following regards:

    a) To act in a reasonably prudent manner by accepting funds in advance on behalf of SCANA for the construction of the Reactor project;

    b) To observe and supervise the work of Westinghouse in a commercially reasonable manner;

    c) To require Westinghouse to utilize a commercially reasonable design for the Reactor project reaction Reactor project;

d) To advance funds for the construction to Westinghouse in a commercially reasonable manger;

e) To administer the contract between Westinghouse and its subcontractors on the one hand and themselves on behalf of SCANA and Santee Cooper on the other in a reasonably prudent manner;

93.     That SCANA has assumed these duties by accepting funds by and through SCANA in advance for the construction of the Reactor project

94.     That SCANA and Santee Cooper have breached that duty in one or more regards as alleged herein.

95.     That SCANA and Santee Cooper' breach of these duties is the actual and proximate cause of Plaintiff Class's injuries.

96.     That as a result of the breach of duty, Plaintiff Class has suffered damages in excess of $2 billion dollars.

## FOR A THIRD CAUSE OF ACTION
### Breach of Contract

97.     Each and every allegation contained in the preceding paragraphs is reiterated as if repeated verbatim to the extent it is not inconsistent with this cause of action.

98.     By accepting funds from Plaintiff Class in advance of construction and completion under the Base Load Review Act, Class Plaintiffs and SCANA have a contractual relationship wherein SCANA charged Plaintiff for sums in advance for the construction of the Reactor project.

99.     SCANA accepted these funds and agreed to supervise the construction of the Reactor project.

100.    SCANA acceptance was manifested when it petitioned the SCPSC on behalf of SCANA for permission to charge Class Plaintiffs in advance pursuant to the Base Load Review Act.

101.    Class Plaintiffs have advanced $1.9 billion dollars to the construction of the Reactor project.

102.    SCANA has breached their agreement with Class Plaintiff in one or more of the following regards:

a)  To act in a reasonably prudent manner by accepting funds in advance for the construction of the Reactor project;

b)  To observe and supervise the work of Westinghouse in a commercially reasonable manner;

c)  To require Westinghouse to utilize a commercially reasonable design for the Reactor project reaction Reactor project;

d)  To advance funds for the construction to Westinghouse in a commercially reasonable manger;

e)  To administer the contract between Westinghouse and its subcontractors  on the one hand and SCANA on the other in a reasonably prudent manner;

103.    As a result of this breach, Class Plaintiffs have suffered damages in the amount of $1.9 billion plus the lost expectation of lower cost electricity and other such actual and consequential damages as may be proved at trial.

## FOR A FOURTH CAUSE OF ACTION
### Quantum Meruit

104.    Each and every allegation contained in the preceding paragraphs is reiterated as if repeated verbatim to the extent it is not inconsistent with this cause of action.

105.    There is an implied contract between Class Plaintiffs and SCANA wherein SCANA charged Plaintiff for sums in advance for the construction of the Reactor project.

106.    SCANA accepted these funds and agreed to supervise the construction of the Reactor project.

107.    SCANA acceptance was manifested when it petitioned the SCPSC for permission to charge Class Plaintiffs in advance pursuant to the Base Load Review Act.

108.    Class Plaintiffs have advanced $1.9 billion dollars to the construction of the Reactor project.

109.    SCANA has breached their agreement with Class Plaintiff in one or more of the following regards: To act in a reasonably prudent manner by accepting funds in advance for the construction of the Reactor project;

      a) To observe and supervise the work of Westinghouse in a commercially reasonable manner;

      b) To require Westinghouse to utilize a commercially reasonable design for the Reactor project reaction Reactor project;

      c) To advance funds for the construction to Westinghouse in a commercially reasonable manger;

      d) To administer the contract between Westinghouse and its subcontractors  on the one hand and SCANA on the other in a reasonably prudent manner;

110.    As a result of this breach, Class Plaintiffs have suffered damages in the amount of $1.9 billion plus the lost expectation of lower cost electricity and other such actual and consequential damages as may be proved at trial.

## PRAYER FOR RELIEF

    **WHEREFORE**, Plaintiff prays that judgment be rendered against the Defendant as follows:

a.    For actual damages, compensatory damages, and consequential damages as may be proven at trial;

b.    For prejudgment interest, postjudgment interest, and costs; and,

c.    For such other and further relief as the Court may deem just and proper.

**THE LAW OFFICES OF JASON E. TAYLOR, P.C.**
_s/ Brian Gambrell_____
Brian C. Gambrell (FED ID NO. 7632)
Office Address:
810 Dutch Square Blvd
Suite 112
Columbia, SC 29210

Mailing Address:
P.O. Box 2688
Hickory, NC 28603
Telephone:  (800) 351-3008
Facsimile: (828) 327-9008
bgambrell@jasonetaylor.com
***Attorney for Plaintiff***

Columbia, South Carolina
September 22, 2017

23